## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHANIKA SMITH,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **No. 20-900** |
| **v.** | : | |
| | : | |
| **RB DISTRIBUTION, INC. ET AL** | : | |
| | : | |
| **Defendants.** | : | |

**McHUGH, J.**                                              **October 28, 2020**

### MEMORANDUM

Cases brought under Title VII alleging hostile work environments necessarily involve a series of qualitative judgments about the acceptability of different kinds of behavior. Courts are required to draw lines between conduct that is deemed merely "inappropriate" and conduct so offensive as to have a detrimental effect on a reasonable employee trying to perform their duties in the workplace. These cases frequently spark motions to dismiss, with the employer arguing that even where behavior is offensive to some degree, it should not be actionable. This is one such case.

In some respects, Plaintiff pleads her case in conclusory ways that do not suffice to support recovery. But at the core of this action are highly specific allegations that, if proven, paint a troubling picture of graphic, sexualized harassment for over a year. Plaintiff further alleges that management ignored her initial report and that it took two additional reports while she endured six more months of harassment until steps were taken to discipline her harasser. And finally, Plaintiff pleads that she was ultimately terminated because she had complained.

Despite certain deficits, Ms. Smith's First Amended Complaint plausibly alleges that she was subjected to a sexually hostile work environment, disparate treatment, and retaliation in connection with her sexual harassment complaint.  Defendants' Motion to Dismiss will therefore be granted in part and denied in part.

I.   **Procedural Posture**

This sex discrimination and retaliation action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §§ 951-963 ("PHRA"), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100 et. seq. ("PFPO").  *See* Compl. ¶ 1, ECF No. 1.  Plaintiff Shanika Smith also pleads common law claims for Intentional Infliction of Emotional Distress ("IIED"), Negligent Hiring/Supervision/Retention, and Assault and Battery.  Smith amended her complaint on June 16, 2020 and included the same causes of action.  *See* First Am. Compl. ¶ 1, ECF No. 11.

Individual Defendants Gerald Bumpers, Ed Ivoc, and corporate Defendants Dorman Products, Inc. and RB Distribution, Inc. (the parent company of Dorman) have filed a motion to dismiss Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6).  *See* Defs.' Mot. Dismiss Pl.'s First Am. Compl., ECF No. 13.  Defendants claim that Smith's pleadings are conclusory and insufficient as a matter of law and that her Title VII, PHRA, and PFPO claims are either untimely or barred on exclusivity grounds.  *See* Mem. Supp. Mot. Dismiss Pl.'s First Am. Compl. 9, ECF No. 13-1 ("Defs. Mem.").  Additionally, Defendants have moved under Rule 12(f) motion to strike portions of Plaintiff's pleadings.  *Id.* at 34.

Defendants' Motion to Dismiss does not encompass the claims against Jose Rosario, which include discrimination under the PHRA, retaliation under the PHRA, aiding and abetting

2

under the PHRA, discrimination under the PFPO, retaliation under the PFPO, aiding and abetting

under the PFPO, intentional infliction of emotional distress, and assault and battery.  This Court

entered a default against Mr. Rosario on May 23, 2020.  *See* ECF No. 8.  Mr. Rosario

subsequently retained counsel, and I granted his motion to set aside the default.

## II.    **Factual Allegations**

Around October 5, 2016, Dorman Products, Inc. hired Shanika Smith as a temporary

"return processor" to inspect defective car parts.  First Am. Compl. ¶ 33.  Earlier in the summer,

Dorman had employed Jose Rosario as a temporary "Material Handler."  *Id.* ¶ 34.  The company

converted both employees to permanent positions in March 2017.  *Id.* ¶¶ 34, 35.

Smith alleges that Rosario began to make unwanted, sexualized advances towards her in

the spring of 2017.  Rosario would ask Smith out on dates, offer to drive her to and from work,

and propose that Smith have sex with him for money.  *Id.* ¶ 37.  Rosario also subjected Smith to

a series of degrading comments, where he made reference to her "really fat ass," told her that he

was aroused by the "vagina print of [her] jeans," and declared that she was "making him hard."

*Id.* ¶¶ 40, 39, 47.  Smith told Rosario that she had a boyfriend and that she wanted him to stop,

but he persisted in his efforts.  First Am. Compl. ¶ 44.  For example, after Smith reminded

Rosario that he was married, he told her that he would treat her like a "queen" if they were in a

relationship.  *Id.* ¶ 46.

Rosario's behavior escalated in the fall of 2017.  Around that time, Smith joined another

male coworker in accepting a ride home from Rosario.  *Id.* ¶ 48.  But after Rosario dropped off

the coworker, he immediately placed his hand on Smith's thigh and attempted to grope her

vagina, saying "[f]uck, that pussy looks fat, Mommy."  *Id.* ¶ 49.  Smith pleaded with Rosario to

"stop" and moved away.  *Id.* ¶ 50.  Following this incident, Smith reported Rosario to her Shirley

Chernyk, her team leader, and subsequently, Gerald Bumpers, a Dorman Human Resources representative, in December 2017.  *Id.* ¶¶ 52, 53.  Smith also told Ed Ivoc, her direct supervisor, about Rosario's actions.  First Am. Compl. ¶ 61.  Following Smith's complaint, Shirley Chernyk also reported to management that she had regularly observed Rosario "lurking near [Smith] as she worked."  *Id.* ¶ 60.

Smith further alleges that Dorman's response to her December 2017 complaint was minimal and inadequate.  Bumpers did not undertake an investigation into Smith's harassment or reprimand Rosario.  *Id.* ¶¶ 55, 56.  Rosario was undeterred by management's response (or lack thereof) to Smith's complaint and persisted in his behavior.  Around February 2018, Rosario told Smith, "You're so thick. The things I would do to you if you gave me a chance."  *Id.* ¶ 67.  He also offered Smith money in exchange for sexual favors, which Smith refused.  *Id.* ¶ 68.  Throughout spring 2018, Rosario made continued to make sexualized comments about Smith's body and refer to her as his "queen."  *Id.* ¶ 78.

After Smith filed her sexual harassment complaint, her relationships with her immediate supervisor and co-workers turned antagonistic.  Smith claims that she previously had a cordial relationship with Ivoc, who also supervised Rosario, *see* First Am. Compl. ¶ 72, but once she complained to management about Rosario, Ivoc began to address Smith in a hostile tone or ignore her whenever she brought up a concern about the business.  *Id.* ¶ 62.  Ivoc also failed to intervene when Rosario and Sophia (last name unknown)—a male friend and coworker of Rosario—began to "excessively monitor" Smith's work and "intentionally sabotage her performance metrics" by providing her with oversized car parts to return.  *Id.* ¶¶ 58, 71, 72.  In March 2018, Smith spoke with Ivoc about Rosario and Sophia's behavior.  *Id.* ¶ 74.  However,

Ivoc did not investigate or address Smith's concerns; instead, he disciplined her for two days without pay. *Id.* ¶ 74.

In response to Rosario's harassment, which had continued throughout the spring of 2018, Smith made a third report to Gerald Bumpers around June 2018. *Id.* ¶ 81. Defendant Dorman terminated Rosario shortly after. First Am. Compl. ¶ 82.

Smith further alleges that her relationship with Ivoc did not improve following Rosario's termination, and that he continued to treat her rudely following Smith's June 2018 complaint. *Id.* ¶ 84. Sophia also continued to target Smith, and on August 31, 2018, Sophia and Smith had an altercation about who was supposed to process a car part, even though it was not Smith's turn to process the part. *Id.* ¶ 86. Sophia yelled at Smith, "I don't deal with you because of what you did to [Rosario]." *Id.* ¶ 87. The next day, Ivoc called Smith into his office to discuss the argument between Smith and Sophia; when Smith tried to explain, Ivoc called her a "liar" and told Smith to "just leave." *Id.* ¶ 89. Smith was suspended two days later, *id.* ¶ 90, and eventually fired by Gerald Bumpers on September 5, 2018. First Am. Compl. ¶ 92.

In response to these events, Smith filed a charge around March 5, 2020 with the Equal Employment Opportunity Commission ("EEOC"), the Pennsylvania Human Relations Commission ("PHRC"), and the Philadelphia Commission on Human Relations ("PCHR"). *Id.* ¶ 24. The charge alleged that Defendants had engaged in discriminatory and retaliatory conduct, in violation of Title VII, the PHRA, and the PFPO. *Id.* ¶ 24.

### III.    <u>Standard of Review</u>

The well-established standard elucidated in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) governs motions to dismiss under Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must include sufficient factual allegations to "show that the claim

is facially plausible." *Id.*  A court must then "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

Defendants have also filed a 12(f) motion to strike.  Courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  There is "general judicial agreement" that these motions "should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy."  5C Arthur R. Miller, Mary Kay Kane & A. Benjamin Spencer, *Federal Practice and Procedure* § 1382 (3d. ed. 2020); *see also DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) ("[S]triking a pleading is a drastic remedy to be resorted to only when required for the purposes of justice and should be used sparingly").

## IV.   Discussion

### A.  Title VII Disparate Treatment

Defendants claim that Plaintiff's disparate treatment claim must be dismissed because she does not set forth sufficient facts to demonstrate that her termination was linked to her gender. *See* Defs. Mem. 15.  Defendants further argue that Plaintiff's allegations of discrimination with respect to her other terms and conditions of employment lack the specificity required to survive a motion to dismiss.  *Id.* at 15-16.

After considering the record, I find that Smith has proffered enough evidence to raise the inference that Defendants engaged in sex-based disparate treatment when they terminated her on September 5, 2018.  However, I grant Defendants' motion with respect to Smith's cursory allegations of disparate treatment in other aspects of her employment.

In order to establish a *prima facie* case of disparate treatment, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position she sought to retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *See Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). This *prima facie* burden is "not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As the Third Circuit has repeatedly recognized, the requirements of a *prima facie* case are flexible and "the fourth element must be relaxed in certain circumstances." *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (citing *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994)) (internal quotations omitted). A plaintiff may meet her *prima facie* burden "by demonstrating generally that 'she was not hired for [a] position or was fired from it under circumstances that could give rise to an inference of unlawful discrimination.'" *Id.* (citing *Waldron v. SL Indus., Inc.* 53 F.3d 491, 494 (3d Cir. 1995)).

The first two elements of Smith's disparate treatment claim are not in real dispute. Smith identifies as a woman and is a member of a class protected by Title VII's sex discrimination provisions. 42 U.S.C. §§ 2000e et seq. Smith has also claimed—and Defendants do not contest—that she was qualified for her position and that Defendant Dorman made her a permanent employee in March 2017. *See* First Am. Compl. ¶ 35. Discovery will likely reveal further evidence that Smith was a qualified employee.

Smith's termination also constitutes a paradigmatic adverse employment action. Title VII prohibits employers from discharging individuals "because of such individual's … sex." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has also defined an adverse action as one that

results in "a significant change in employment status, such as hiring [and] firing." *Burlington*

*Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Smith's factual allegations, construed in the light most favorable to her, raise a

reasonable inference that her gender played a motivating or determinative factor in her

termination.  As the Third Circuit noted in *Jensen v. Potter*, evidence that a woman was

subjected to adverse employment actions following a complaint of sexual harassment will almost

always "give rise to a reasonable inference that the harassment [based on the complaint] would

not have occurred if the person making the complaint were a man" and present a question to the

trier of fact. 435 F.3d 444, 454 (3d Cir. 2006), *abrogated on other grounds by* 548 U.S. 53

(2006).  Here, Smith has claimed that she reported Rosario's conduct in December 2017 and

March 2018 but received little to no response from Defendants.  *See* First Am. Compl. ¶¶ 52, 55,

56.  Smith has further alleged that she was suspended without pay in March after reiterating her

concerns, *id.* ¶ 74,[1] and that Defendant Ivoc, who was likely involved in the decision to terminate

her, had treated her with hostility and called her a "liar" shortly before her termination.  *Id.* ¶¶

84, 89.  These claims plausibly suggest that Smith would not have been terminated had she been

a man.  *See Jensen*, 435 F.3d at 454.

Defendants take issue with Smith's failure to identify specific comparators at this stage,

but their emphasis on comparator evidence is overly rigid.  *See* Defs. Mem. 14 (urging dismissal

because "[Smith] sets forth allegations as to how Smith, and only Smith, was allegedly treated").

As the Supreme Court recently emphasized, "an employer cannot escape liability by

---

[1] The March suspension is not actionable in its own right because it falls outside of the 300-day statutory period but may be considered as background evidence of discrimination.  *See United Air Lines Inc. v. Evans*, 431 U.S. 553, 558 (1977) (noting that a discriminatory act that is not the basis of a timely charge "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue"); *see also Stewart v. Rutgers, the State University*, 120 F.3d 426, 433 (3d Cir. 1997) (establishing that while a discrimination claim based on a tenure denial was itself barred, the events surrounding the denial were relevant evidence that could be used at trial).

demonstrating that it treats males and females comparably as groups." *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731, 1744 (2020). The existence of comparators may serve a useful evidentiary function but firing a woman because she fails to conform to gender stereotypes constitutes a violation on its own terms. *Id.* at 1741; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("stereotyped remarks can certainly be *evidence* that gender played a part"); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 36f F.3d 107, 122 (2d Cir. 2004) ("stereotyping of women as caregivers can by itself and without more by evidence of an impermissible, sex-based motive"). Discovery may also reveal evidence that Smith's termination was motivated by sex stereotypes, including the pernicious view that women who file sexual harassment and gender-based violence complaints are liars.[2]

The evidence, when construed in favor of Smith, suffices to demonstrate that she was terminated under circumstances that could give rise to an inference of unlawful discrimination. Because Plaintiff has established a *prima facie* case of disparate treatment, the burden now shifts to Defendants to offer a legitimate, nondiscriminatory reason for the adverse employment action. *See Burdine*, 450 U.S. at 254. Nonetheless, to the extent that Smith alleges other adverse actions that merely parrot the statutory standards, these claims do not carry the presumption of truth at the motion to dismiss stage.[3] *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790-791 (3d Cir. 2016).

---

[2] *See, e.g.*, Deborah Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount*, 166 U. Pa. L. Rev. 1, 9 (2017) (describing "recurring tropes" of disbelief accompanying female rape victims, namely that "the rape accuser is malicious or vindictive and therefore lying about her rape; she is regretful about consenting to sexual activity with the accused and therefore lying about her rape; or she is incapable of assessing whether she consented due to intoxication, and therefore lying when she claims otherwise").

[3] These allegations include assertions that Defendants "engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiff with respect to her compensation, terms, conditions, training and privileges of employment because of her sex and gender." First Am. Compl. ¶ 111. Other boilerplate allegations include the claim that "Defendants subjected Plaintiffs to adverse tangible employment actions—defined as significant changes in Plaintiffs' employment status, discipline, denial of training, failure to promote,

B.  Title VII Hostile Work Environment

Defendants first argue that Plaintiff's hostile work environment is untimely, even under a continuing violation theory, as Smith does not identify any specific instances of harassment that occurred after "spring of 2018."  Defs. Mem. 17.  Turning to the merits, Defendants further claim that Rosario's conduct does not rise to the level of "severe or pervasive harassment" and that Smith cannot show *respondeat superior* liability, as the Defendants' alleged failure to take remedial action fell outside of the Title VII statutory window for actionable conduct.  *Id.* at 19-22.

I find that Smith's hostile work environment claim and Defendants' failure to take remedial action are actionable as continuing violations.  For purposes of this motion, I also conclude that Smith experienced harassment that could be classified as severe or pervasive.

**1.  Smith's Allegations are Timely and May Be Aggregated as Continuing Violations**

Smith filed a charge with the EEOC on March 5, 2019.  First Am. Compl. ¶ 24.  Under Title VII, complainants may file a charge with the EEOC within 300 days of the date of the alleged discriminatory practice.  42 U.S.C. § 2000e-5(e)(1).  Three hundred days prior to March 5, 2019 is May 9, 2018.

When assessing timeliness, the Supreme Court has differentiated between "discrete acts" and "hostile work environments."  For discrete acts, which are "easy to identify" and include "termination, failure to promote, denial of transfer, or refusal to hire," parties must file charges within the statutory timelines or "lose the ability to recover for it."  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 110 (2002).  Hostile work environments, by contrast, are

---

reassignment with significantly different job responsibilities, and decisions causing significant changes in her employment benefits."  *Id.* ¶ 112.

made up of separate acts; even if the acts are not actionable in their own right, they may collectively comprise a discriminatory employment practice. *Id.* at 115 – 117. Because a hostile work environment "cannot be said to occur on any particular day," plaintiffs may recover for acts that predate the statutory period if the acts are part of a "continuing violation." *Id.* at 115–117.

To demonstrate a continuing violation, Smith "must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Mandel v. M&Q Packaging Corp*, 706 F.3d. 157, 166–167 (3d Cir. 2013). The Third Circuit has directed district courts to consider "subject matter" and "frequency" when distinguishing continuing violations from isolated incidents. *Id.* at 166. Courts should look to "whether the violations constitute the same type of discrimination" (subject matter) and whether the conduct "involved similar conduct by the same individuals, suggesting a persistent, ongoing pattern" (frequency). *Id.* at 166 n.2; *see id.* at 167 (noting that the Supreme Court abrogated a previous permanency requirement in *Morgan,* 536 U.S. 101, 117–118 (2002)).

Smith has clearly satisfied the "subject matter" and "frequency" requirements. The conduct that she describes as a hostile environment includes repeated sexualized advances by the same individual—Rosario—that began in the spring of 2017 and ended only when he was fired in June 2018. *See* First Am. Compl. ¶¶ 36, 37, 49, 78. Smith describes at least six instances of explicit, unwelcome sexualized comments, which include Rosario telling her that he was aroused by the "vagina print from [her jeans];" that she "[had] a really fat ass;" that he would treat her like a queen if she were his; that she was making him hard; that her "pussy looks fat" as well as fantasizing about the things he would do to her if she gave him a "chance." *Id.* ¶¶ 39, 40, 46, 47, 49, 67. She also states that Rosario attempted to grab her vagina and offered her money in

11

exchange for sexual favors.  *Id.* ¶¶ 49, 68.  Rosario's alleged actions constitute the same type of sexually discriminatory harm and occurred on a frequent enough basis to suggest an "ongoing pattern."  *Mandel*, 706 F.3d at 166–167.

Defendants argue that Smith's hostile work environment claim must be dismissed because a court could not infer that Rosario acted after May 8, 2018.  At the motion to dismiss stage, I must "assume all remaining factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Connelly*, 809 F.3d at 790 (citing *Foglia v. Renal Ventures Mgmt., LLC,* 754 F.3d 153, 154 n.1 (3d Cir. 2014)).  Plaintiff's pleadings lack detail; for example, she claims, without specifying, that Rosario made uninvited comments "on almost a daily basis."  First Am. Compl. ¶ 37. However, Smith's statement that she complained about Rosario's conduct for the third time in June 2018 invites at least two inferences.  A factfinder could believe that Rosario ceased his targeting of the plaintiff after the spring of 2018 but that Smith, concerned that the harassment would begin anew, preemptively filed a third complaint.  But in the alternative, a factfinder could also maintain that Smith filed her third complaint because Rosario persisted in his conduct after May 9, 2018.  At this stage of the litigation, I am bound to accept the latter explanation and infer that at least one discriminatory act occurred within the statutory period.

## 2.  Smith's Hostile Work Environment Allegations Survive a Motion to Dismiss

Turning to the merits, Smith must establish that 1) she suffered intentional discrimination because of her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected her, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.  *See Mandel*, 706 F.3d. at 167.

a.  *Smith Has Demonstrated that Rosario Acted "Because of Sex"*

A reasonable factfinder could readily believe that Smith's gender motivated Rosario's conduct.  In *Jensen*, the Third Circuit reasoned that when harassment involves "sexual propositions, innuendo, pornographic materials, or sexually derogatory language," an inference of sex-based intent will usually arise.  435 F.3d at 454.  Under Third Circuit precedent, Smith's pleadings regarding Rosario's repeated, sexualized conduce clearly suffice to suggest a sex-based motivation.[4]

b.  *Smith Experienced Severe or Pervasive Conduct*

Rosario's alleged conduct toward Smith would also meet the severe or pervasive standard.  Conduct is severe or pervasive when it is "sufficient 'to alter the conditions of [the employee's] employment and create an abusive working environment.'"  *Moody v. Atlantic City Board of Education*, 870 F.3d 206, 214 (3d Cir. 2017) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  To assess whether an environment is abusive or hostile, a district court must consider the totality of the circumstances, which include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

---

[4] Overtly sexualized conduct is usually understood to be gender-based. In this vein, Smith has pled that Rosario did not treat male employees in the same sexualized manner.  *See* First Am. Compl. ¶ 42.  But some legal scholars have pointed out that this assumption, while efficient, may under circumstances fail to "provide an adequate account of why sexual harassment is a form of sex discrimination."  Katherine M. Franke, *What's Wrong with Sexual Harassment*, 49 Stan. L. Rev. 691, 693 (1997).  Such a narrow formulation may limit courts in their ability to address gendered harassment when it takes other forms or when it involves individuals or the same gender. Conceptually, Smith's theory that the harassment she experienced was because of sex could potentially be supported on other grounds.  Rosario allegedly made specific anatomical references associated with women, referring to Smith's "pussy" and stating that he "aroused by the vagina print from [jeans]."  He also attempted to grope Smith's vagina, an act that is decidedly linked to her sex.  Alternatively, a factfinder might conclude that Rosario's sexualized conduct and references to Smith as "mommy" and his "queen" represent sex stereotypes of women as passive sexual objects.  Such subtle distinctions can have greater significance in a case where a plaintiff contends that the harasser is the same gender as the harassed.

performance." *Mandel*, 706 F.3d at 168 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

Despite Smith's best efforts to maintain a cordial and professional relationship with Rosario, she was subjected to a torrent of graphic, sexualized conduct. On "almost a daily basis," Rosario reminded Smith that he viewed her solely as a collection of body parts, referring to a "vagina print" from jeans, her "fat ass," her "pussy," his own erection, and exchanging money for sex. First Am. Compl. ¶ 39, 40, 49, 47, 68. He repeatedly violated her sexual boundaries, going so far as to attempt to grope her vagina as they rode together in a car. *Id.* ¶ 49. Rosario targeted Smith for over a year, and the "intolerable" work environment that resulted drove Smith to file three complaints against him with management. *Id.* ¶¶ 52, 74, 81.

Defendants attempt to frame Rosario's alleged statements as merely "inappropriate." I emphatically disagree. No one in the workplace should have to endure unwelcome, anatomically explicit, crass sexual comments. Defendants cite a series of district court and non-precedential Third Circuit cases where the conduct at issue was found not to rise to a hostile environment. *See* Defs. Mem. 19–20. But these cases clearly address conduct of a significantly different nature. The comparison to *Tourtellotte*, for example, is unpersuasive, as a supervisor's references to women as "honey," "pretty girls," and "Barbie girls," while arguably sexist, are not nearly as explicit and graphic as the comments Rosario made to Smith. *Tourtellotte v. Eli Lilly & Co.*, No. 09-0774, 2013 WL 1628603, at *4 (E.D. Pa. Apr. 15, 2013), *aff'd*, 636 Fed. Appx. 831 (3d. Cir 2016). Viewed collectively, Smith's account provides sufficient evidence upon which a reasonable juror could conclude that she experienced severe or pervasive harassment that interfered with her work performance, in violation of Title VII's equality mandate. *See Harris*, 510 U.S. at 2; *see also Moody*, 870 F.3d at 214.

c.  *The Alleged Discrimination Impacted Smith and Would Impact a Reasonable Person*

Smith's testimony also provides a basis from which a reasonable fact finder could infer

that Rosario's conduct detrimentally impacted her and would have impacted a reasonable person

in similar circumstances.  Smith routinely made her subjective feelings toward Rosario's conduct

clear and told Rosario to stop making comments about her body.  First Am. Compl. ¶ 39.  She

stated that she was "extremely offended and disgusted" by his conduct.  *Id.* ¶ 41.  Smith also

reported Rosario's conduct on three occasions and declared that his comments toward her "need

to change."  *Id.* ¶ 54.  Smith clearly believed that her work environment was abusive.  *See*

*Harris*, 510 U.S. at 21.  Moreover, a reasonable person would also likely find such an

environment to be hostile and abusive, as Rosario's alleged behavior included repeated

sexualized conduct and an attempted groping.  *Id.*

d.  *Smith Has Shown Respondeat Superior Liability*

And finally, Smith's pleadings sufficiently demonstrate *respondeat superior* liability.

When a harassing employee does not supervise the victim, the plaintiff must show that the

"defendant knew or should have known of the harassment and failed to take prompt remedial

action."  *Kunin v. Sears Roebuck & Co.,* 175 F.3d 289, 293–94 (3d Cir. 1999).  In assessing

Defendants' knowledge in this case, I am not bound to solely consider events that arose during

the 300-day statutory period, as Smith has alleged sufficient facts to support application of a

continuing violation theory.  *See West v. Phila. Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995)

(noting that, in continuing violation cases, the "Federal Rules of Evidence and the substantive

law at issue, rather than the statutory filing period, should govern evidentiary determinations of

the trial court").  Here, Smith has claimed that she reported Rosario's harassment to Human

Resources on three separate occasions before he was terminated in June 2018.  First Am. Compl.

¶¶ 52, 74, 81.  These allegations, if proven, would be sufficient to demonstrate that Defendants had notice of the harassment.  *Id.* ¶¶ 53, 81.  Moreover, Smith has also claimed that the Defendants did not undertake an investigation or remedial action until Rosario was terminated in June 2018.  *See* First Am. Compl. ¶ 55. Smith has, therefore, adequately pleaded  Defendants' knowledge and failure to take remedial action, as required under *Kunin*, 175 F.3d at 293–94.

C.  Title VII Retaliation

Title VII's antiretaliation provision bars employers from discriminating against employees that oppose unlawful conduct or participate in Title VII investigations or proceedings. 42 U.S.C. § 2000e-3.  Smith's pleadings suggest three potential violations of the statute: (1) that Defendants disciplined her in March 2018 in retaliation for her complaints; (2) that Defendants' antagonism and refusal to remedy Rosario's harassment fostered a retaliatory hostile work environment in its own right; and (3) that Defendants fired her in September 2018 because she opposed sexual harassment.

Defendants offer several arguments in opposition.  First, they contend that almost all the alleged retaliatory responses are not actionable, as they occurred prior to the statutory window. *See* Defs. Mem. 22–23. Second, Defendants aver that Plaintiff has insufficiently pled the elements of a retaliatory hostile environment theory.  *See* Defs. Reply Mem. Supp. Mot. Dismiss Pl.'s Compl. 8–9 ("Defs. Reply").  And third, with respect to the claim that Defendants admit is actionable, the September 5, 2018 termination, Defendants argue that Smith has failed to proffer facts sufficient to demonstrate causation.  *See* Defs. Mem. 13.

I conclude that Smith may pursue her retaliation claim related to her September termination, as well as her retaliatory hostile environment claim, a separate theory that addresses

harassment that a plaintiff has sustained because the plaintiff opposed an illegal practice or participated in a Title VII proceeding.

**1. Timeliness of Retaliation Claims**

I find that Smith's September 5, 2018 termination and ongoing retaliatory hostile environment claims are timely. In contrast, the March 2018 suspension is not timely because it is a discrete act that falls outside of the statutory period. Nonetheless, the suspension may be considered as background evidence in assessing causation for the other retaliation claims.

a. *September 5, 2018 Termination and March 2018 Suspension*

Smith's retaliation claim is timely insofar as relates to her September 5, 2018 termination. Termination is a "discrete" act under Title VII. *See Morgan*, 536 U.S. at 114 (stating that "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify"). Suspension is also a discrete act. *Id.* at 114–116 (noting that Morgan's claim of wrongful suspension and discipline was a prior discrete discriminatory act that was untimely filed and no longer actionable). "A discrete retaliatory or discriminatory act occurred on the day that it happened. A party, therefore, must file … within either 180 or 300 days of the date of the act." *Id*. at 110. In this matter, Smith filed with the EEOC on March 5, 2019 which renders all conduct following May 9, 2018, including the September 5, 2018, termination, actionable.

By this logic, the March suspension is not actionable as retaliation, although it may be considered as background evidence. *See United Air Lines Inc. v. Evans*, 431 U.S. 553, 558 (1977); *Stewart v. Rutgers, the State University*, 120 F.3d 426, 433 (3d Cir. 1997).

b.  *Retaliatory Hostile Environment Claim*

Smith has also argued that she experienced retaliation that fostered a hostile work
environment.  The Third Circuit has recognized retaliatory hostile work environment claims
where an employee is subjected to a hostile work environment in retaliation for having engaged
in protected activity.  *See Jensen*, 435 F.3d at 448–450 (addressing an alleged hostile
environment that emerged as the plaintiff filed a sexual harassment complaint); *see also Komis v.
Secretary of the United States Department of Labor*, 918 F.3d 289, 293 (3d Cir. 2019) (affirming
plaintiffs' ability to bring retaliatory hostile environment claims).  Smith has also claimed that
Defendants are liable for acts preceding May 9, 2018, as part of a continuing violation.  To
invoke the continuing violation doctrine, Smith "must show that all acts which constitute the
claim are part of the same unlawful employment practice and that at least one act falls within the
applicable limitations period."  *Mandel*, 706 F.3d at 165–166.

Viewing the evidence in the light most favorable to Smith, a reasonable factfinder could
find that Defendants' failure to investigate Rosario's harassment, discipline of Smith, and
persistent antagonism were part of the same retaliatory practice.  First, Smith describes
Defendants' failure to investigate or remediate Rosario's alleged harassment until her complaint
in June 2018.  The Supreme Court has suggested that a failure to investigate an employee's
complaint could constitute actionable retaliation.  *See Burlington Northern v. White*, 548 U.S. 53,
63–65 (2006) (citing with approval *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006), a case
holding that retaliation could include the FBI's refusal to investigate death threats against a
federal agent and his wife).  Second, Smith has also proffered evidence suggesting that Ivoc,
Rosario, Sophia, and Bumpers were persistently hostile towards her and that Ivoc and Bumpers
were involved in decisions to formally discipline her following her complaints regarding

Rosario's conduct.  A reasonable factfinder could conclude that these actions all pertained to the same subject matter—retaliation against Smith for filing a sexual harassment complaint—and that the combination of the ongoing failure to remedy Rosario's conduct, the discipline, and the continual antagonism suggested a "persistent, ongoing pattern," as opposed to isolated incidents. *Mandel*, 706 F.3d. at 157, 167.

A reasonable juror could also conclude that at least one act occurred within the statutory period.  Taking all inferences in favor of Smith, it appears that management did not act to investigate Smith's harassment claim or discipline Rosario until her third complaint in June 2018, a failure that would fall within the statutory period (after May 9, 2018).  Moreover, Smith also describes Ivoc treating her with disrespect, Sophia nitpicking her work, Sophia yelling at her and making her perform duties outside of her job description, Ivoc calling her a liar, and Bumpers suspending and then firing her, with all of these acts occurring after May 9, 2018.  *See* First Am. Compl. ¶¶ 84, 85, 86, 89, 90, 92.  As such, the continuing violation doctrine is satisfied, and the entire retaliatory hostile environment claim may be actionable.

### 2. Merits of the September 5, 2018 Termination Claim

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  *Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir. 2006). Because a termination clearly constitutes an adverse action, I primarily will focus on whether Smith engaged in protected activity and causation.

Smith's pleadings raise the inference that she engaged in protected activity.  The Third Circuit has held that formal and informal complaints of discrimination, which includes

harassment, constitute protected activities. *See Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir. 2001) ("[T]he complaints to [defendant], whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case, provided the complaints expressed Abramson's opposition to a protected activity under Title VII"). Smith has claimed that she filed three complaints regarding Rosario's conduct with Human Resources, which if true, would clearly qualify as protected activity.

With respect to the causal connection between participation in protected activity and adverse action, the Third Circuit has also clarified that plaintiffs bringing retaliation claims have a lesser burden at the *prima facie* stage of the case. *See Carvalho-Grevious v. Delaware State University*, 851 F.3d 249, 258 (3d Cir. 2017). A plaintiff does not need to prove "but for" causation at the *prima facie* stage, as such a standard would abrogate the *McDonnell-Douglas* shifting burdens framework. *Id.* at 259–260. Rather, the question is whether the plaintiff has "produced evidence from which a reasonable factfinder could conclude that her engagement in a protected activity was the *likely reason* for the adverse employment action." *Id.* at 261. Plaintiffs may produce a wide array of evidence to demonstrate the causal link: an employer's inconsistent explanation, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive. *Id.* at 260. Alternatively, the evidence may, when taken as a whole, suffice to raise the inference. *Id.*

At this stage of the case, Smith's evidence suggests a pattern of antagonism connected to her protected complaint,[5] which persisted even after Defendants fired Rosario. Smith has claimed that Defendants repeatedly failed to take remedial action in response to her initial two

---

[5] Defendants argue that "[t]o be sufficient in terms of causal connection, the temporal proximity must be "unusually suggestive" of retaliatory motive." *See* Defs. Mem. 23. However, as recent Third Circuit authority makes clear, temporal proximity is only one evidentiary factor a court may consider. *See Carvalho-Grevious*, 851 F.3d at 260. A pattern of antagonism may also raise the inference.

complaints, First Am. Compl. ¶ 77; that Ivoc's demeanor towards her changed after she filed the

complaint, *id.* ¶¶ 62, 63; that Ivoc failed to intervene when Rosario and Sophia sought to

sabotage Smith's work performance, *id.* ¶ 72; that Smith was suspended in March 2018 after

complaining about Rosario and Sophia, *id.* ¶ 74; that Sophia and Ivoc persisted in their

antagonism after Rosario was fired, *id.* ¶¶ 84, 85; that Defendant Ivoc called her a "liar," First

Am. Compl. ¶ 89; and that Smith was suspended and then fired following an altercation with

Sophia, *id.* ¶¶ 90, 92.  These incidents may not, individually, rise to actionable retaliation.

However, when viewed in the light most favorable to Smith, they raise the inference that Smith's

protected activity was the likely reason for her firing.  Defendant must now bear the burden of

production and offer an alternative explanation for her termination.

### 3. Merits of the Retaliatory Hostile Work Environment Claim

A retaliatory hostile work environment claim goes beyond discrete acts of retaliation and

is based on a contention that the employer permitted a hostile environment to develop as a result

of an employee's opposition to an illegal practice or participation in a Title VII proceeding.  The

law of retaliatory hostile work environments remains somewhat unsettled.  The Third Circuit

first introduced this theory in *Jensen*, where it held that the plaintiff could prevail by showing

that the retaliatory conduct was "severe or pervasive enough to alter the conditions of [her]

employment and create an abusive working environment."  435 F.3d 444, 451 (3d Cir. 2006)

(internal citations omitted).  Thereafter, in *Burlington Northern*, the Supreme Court applied a

"material adversity" standard and directed courts to look to whether a challenged action "might

have dissuaded a reasonable worker from making or supporting a charge of discrimination."  548

U.S. at 68 (internal citations omitted).

The Third Circuit returned to the subject of retaliation in *Moore v. City of Phila.*, positing that "[t]o establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  461 F.3d at 340–341. In a discussion of *Jensen,* the *Moore* court reasoned that *Jensen*'s holding was contradicted by the Supreme Court's conclusion in *Burlington Northern* "that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  *Id.* at 341.  Accordingly, the *Moore* court concluded that the proper standard for evaluating a hostile environment claim was the "material adversity" standard.  *Id.* at 341–342.

The state of the law has remained unclear following *Moore*.  As the Third Circuit noted in *Komis*, several courts of appeals have continued to apply a "severe or pervasive" standard to retaliatory hostile work environment cases even after *Burlington Northern*.  918 F.3d at 299 n.9. However, in *Komis*, the Third Circuit reiterated in 2019 that the "material adversity" standard was proper in retaliatory hostile environment claims.  *Id.* at 299.  Conceptually, the "material adversity" standard appears broader than the "severe or pervasive" standard insofar as it also addresses retaliatory conduct that occurs outside of the workplace or does not directly impact employment.  *Burlington Northern,* 548 U.S. at 63. All the same, the Third Circuit has made clear that the "material adversity" standard continues to "separate significant from trivial harms" and "unquestionably leaves in place a plaintiff's burden to show the allegedly hostile work environment was motivated by retaliatory animus."  *Komis*, 918 F.3d at 299.[6]

---

[6] As interpreted by the Third Circuit, the "material adversity" standard does not meaningfully diverge from the "severe and pervasive" standard with respect to the degree of the harm required.  In *Komis*, the plaintiff argued that

Based on this analysis, I believe that "material adversity" is the appropriate standard to apply in retaliatory hostile work environment cases within the Third Circuit, and I will apply the test articulated in *Moore*.  In that case, the Third Circuit concluded that a reasonable worker would be dissuaded from making or supporting a charge of discrimination in response to conduct that included interference with his position, being told that other officers were "out to get him," false discipline, and another officer's involvement with the plaintiff's custody battle with the mother of his child.  461 F.3d at 348.  In this matter, a juror could similarly find that Defendants' failure to respond to two sexual harassment complaints, unwarranted discipline, Sophia and Rosario's interference with Smith's job performance, and the general antagonism towards Smith would be sufficient to deter a reasonable worker from making a charge of discrimination.  Smith has also raised the inference that these actions were motivated by retaliatory animus, as Ivoc's antagonism arose only after Smith filed a complaint; the March 2018 discipline occurred close in time to Smith's attempt to follow up on her harassment claim; and Sophia specifically referenced the complaint against Rosario as motivation for his actions.  *See* First Am. Compl. ¶¶ 62, 74, 87.

D. <u>Pennsylvania Human Relations Act Claims</u>

Defendants also argue that Plaintiff's PHRA claims are time-barred and lack the requisite specificity to survive a motion to dismiss.  *See* Defs. Mem. 24, 26. Defendants further claim that Plaintiff's aiding and abetting claim cannot survive if her other PHRA claims are dismissed.  *Id.* at 26.  I agree.

Plaintiff's PHRA claims are untimely.  The Act provides that, "[a]ny complaint filed pursuant to this section must be so filed within one hundred eighty days after the alleged act of

---

the court's selection of the "severe and pervasive" standard for jury instruction in her retaliatory harassment claim was error because it imposed a higher burden than the "material adversity" standard.  918 F.3d at 299.  The Third Circuit concluded that any error was harmless, thereby implying that as to the degree of the harm required for plaintiff to prevail, there is little practical difference between the standards.  *Id.*

discrimination, unless otherwise required by the Fair Housing Act." 43 Pa. Cons. Stat. § 955(h).

Federal and state courts have interpreted this requirement strictly and have repeatedly required

injured persons to "avail themselves of the administrative process of the Commission or be

barred from the judicial remedies." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir.

1997) (citing *Vincent v. Fuller Co.,* 532 Pa. 547, 616 (1992)).  Smith filed with the Pennsylvania

Human Rights Commission on March 5, 2019.  First Am. Compl. ¶ 24.  The statutory window,

therefore, began on September 6, 2018.  Because Smith was terminated on September 5, 2018

and does not allege any conduct within the PHRA statutory period, I will grant Defendants'

motion with respect to this claim.

Because there is no actionable discrimination under the PHRA in this matter, Smith's

aiding and abetting count necessarily fails.  The PHRA prohibits "any person, employer,

employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the

doing of any act declared by this section to be an unlawful discriminatory practice …" 43 Pa.

Cons. Stat. § 955(e).  The Third Circuit does not appear to have addressed this precise question,

but I am persuaded by the district court's reasoning in *Scott v. Sunoco Logistics Partners*, 918

F.Supp.2d 344, 357 n.5 (E.D. Pa. 2013).  There, the court noted that because the corporate

defendant was not liable for discrimination or retaliation, individual defendants could not be

liable under an aiding and abetting theory.  *Id.*  That logic applies squarely to this case.

E. Philadelphia Fair Practices Ordinance Claims

Defendants also argue that Plaintiff's PFPO claims "should be dismissed because: (1)

Smith has invoked her rights under the PHRA, which precludes her PFPO claims; (2) the

corporate defendants, in that they are not located in Philadelphia, are not covered by the PFPO;

and (3) Smith's PFPO claims fail for the reasons detailed at length."  Defs. Memo. 27.  Once

again I agree and will therefore dismiss Smith's PFPO claims pursuant to the plain meaning of the statute and Smith's failure to administratively exhaust her claims.

The ordinance provides that "[t]he Commission *shall not* accept a complaint from any person who has filed a complaint with the Pennsylvania Human Relations Commission with respect to the same grievance." Phila. Code § 9-1112(4) (emphasis added). Additionally, plaintiffs may only exercise a private right of action after invoking the Commission's procedures and receiving notice from the Commission. *Id.* § 9-1122. Smith has stated that she filed with the Human Relations Commission on March 5, 2019, First Am. Compl. ¶ 24, which would bar her PFPO claim. Smith has also not demonstrated that she properly invoked the Commission's procedures and received the requisite notice that she would need to pursue a PFPO claim before this Court. Therefore, I will grant Defendants' motion to dismiss with respect to these claims.

F.  Intentional Infliction of Emotional Distress

Defendants contend that Smith's IIED claim is subject to preemption under the PHRA. *See* Defs. Mem. 32 n7. They also argue that Smith has failed to allege that Defendants engaged in conduct that was extreme and outrageous. *Id.* at 31. I need not address Defendants' preemption claim insofar as I find that Smith's pleadings do not establish that the conduct of the moving Defendants—who were one step removed—was extreme and outrageous.

To establish a claim for intentional infliction of emotional distress, "(1) the conduct [of the defendant] must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; [and] (4) the distress must be severe." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997). The burden of demonstrating outrageous conduct is substantial; plaintiffs must show that the actions have been "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (Am. Law Inst. 1965). The Pennsylvania Supreme Court has also noted that the availability of recovery under Section 46 of the Second Restatement is "highly circumscribed." *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 190 (1987).

Taking all the evidence in favor of Smith, I cannot infer that Defendants' conduct was extreme and outrageous. The Pennsylvania Supreme Court has noted that defendants could potentially be liable for IIED if they engaged in both sexual harassment *and* retaliation. *See Hoy v. Angelone,* 554 Pa. 134, 153–154 (1998); *see also Bowersox v. P.H. Glatfelter Co.,* 677 F. Supp. 307, 310 (M.D. Pa. 1988) (noting that IIED was plausible where plaintiff's supervisor sexually harassed her, withheld information from her that she needed to perform her job, and forbade her from speaking with others in the office). Here, however, with the exception of Rosario, Smith does not allege that Defendants engaged in sex-based harassment towards her. Rather, Smith's claims against Defendants center on their failure to remedy Rosario's sexual harassment and their retaliatory antagonism towards her. While this conduct may constitute actionable discrimination and retaliation, I cannot presume that it would be viewed as "utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (Am. Law Inst. 1965). Moreover, Smith's conclusory allegations that "[d]efendants intentionally and recklessly harassed and inflicted emotional injury on Plaintiff by subjecting her to outrageous treatment beyond all bounds of decency" are insufficient to overcome this burden. First Am. Compl. ¶ 182.

G. Negligent Hiring/Negligent Supervision/Negligent Retention

Defendants primarily argue that Smith' claim is preempted by the PHRA and that she cannot show that Defendants had knowledge of Rosario's propensities at the time of his hire.

*See* Defs. Mem. 32.  Although Defendants' reasoning is persuasive with respect to Plaintiff's

negligent hiring claim, Smith's negligent supervision/retention claim is legally sufficient to

survive a motion to dismiss.

Defendants contend that Smith's tort claim is preempted by the PHRA, but their

interpretation of the statute's exclusivity provisions is overbroad.  The PHRA bars actions "based

on the same grievance," which pertain to the forms of discrimination that are "declared unlawful

by section 5 of this Act."  43 Pa. Cons. Stat. § 962(b).  State courts have made clear that

plaintiffs may bring common law actions based on the same facts as their PHRA claims when the

action would serve a different purpose than the elimination of discrimination.  *See Schweitzer v.*

*Rockwell International,* 586 A.2d 383, 391 (Pa. Super. Ct. 1990) (stating that "[n]othing in the

language of the Act itself or in the expressed legislative intent shows that the Legislature

intended to extinguish common law rights").  Smith's claim here pertains to Defendants'

negligence, as opposed to their discrimination.  Moreover, Smith's negligence claim is not

inextricably bound up with her discrimination claim, as she could theoretically prevail on the

negligence claim even if she could not prove discrimination.  *Compare with Weirich v. Horst*

*Realty Corp. LLC*, No. 07-871, 2007 U.S. Dist. LEXIS 50923, at *4 (E.D. Pa. Jul. 13, 2007)

(dismissing plaintiffs' claim as preempted on the ground that plaintiff must prove discrimination

to prove the breach of contract claim).

However, Smith's negligent hiring claim must be dismissed, as she has failed to plausibly

allege that Defendants had notice of Rosario's harassing propensities at the time of his hire.  A

plaintiff seeking recovery due to negligent hiring must show that  (1) the employer knew or

should have known of the violent propensity of the employee and (2) such employment creates

a situation in which a third party may be harmed.  *Coath v. Jones*, 419 A.2d 1249, 1250 (Pa.

Super. Ct. 1980) (citing *Dempsey v. Walso Bureau Inc.*, 431 Pa. 562 (1968)).  Smith has claimed

that Defendants hired Rosario in 2016, converted him to a full-time employee around March

2017, and that Rosario began to harass Smith in the spring of 2017.  *See* First Am. Compl. ¶¶ 34,

36. She also offers the conclusory allegation that, "Defendant DORMAN knew, both during the

hiring process and throughout Defendant ROSARIO's employment, that the aforementioned

individual had inappropriate or dangerous characteristics." *Id.* ¶ 191.  This evidence does not

raise a plausible inference that Defendants knew of Rosario's harassing tendency at the time that

he was hired.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

By contrast, Smith has established an adequate factual basis with respect to her negligent

supervision and retention claims.  A negligent supervision action "requires the four elements of

common law negligence, *i.e.,* duty, breach, causation, and damages." *Belmont v. MB Inc.*

*Partners, Inc.*, 708 F.3d 470, 488 (3d Cir. 2013).  The plaintiff must demonstrate a loss that

resulted from "(1) a failure to exercise ordinary care to prevent an intentional harm by an

employee acting outside the scope of his employment, (2) that is committed on the employer's

premises, (3) when the employer knows or has reason to know of the necessity and ability to

control the employee." *Id.* at 487-488 (citing *Dempsey v. Walso Bureau*, Inc., 431 Pa. 562

(1968)).

Plaintiffs must further satisfy two foreseeability requirements. First, they must show that

the employer "knew or should have known of the necessity for exercising control of its

employee." *Id.* at 491.  This requirement arises from § 317 of the Restatement (Second) of

Torts. *Id.* at 491.  Second, "the harm that the improperly supervised employee caused to the

third party must also have been reasonably foreseeable." *Id.* at 491.  This requirement arises

from "§ 213 of the Restatement (Second) of Agency, which requires that all of the elements of the tort of negligence exist in order for liability for negligent supervision to attach." *Id.* at 491.

By way of example, the Supreme Court of Pennsylvania applied these factors in its examination of whether the leadership of a Catholic diocese could be held liable for child sex abuses perpetrated by a priest.  The court noted that

> [W]e find that a school district or school administrative unit (school) has a duty not to hire or retain employees that it knows or should know have a propensity for sexually abusing students. Where the plaintiff can establish that the school knew or reasonably should have known of such a propensity, the school will generally be liable for the foreseeable sexual abuse of students by that employee. Liability based on negligent hiring or retention is not limited to abuse that occurs during the school day. A school may be liable for abuse of a student by a school employee outside of school hours where there is a causal connection between the particular injury and the fact of employment. Also, a school can be held liable for injuries suffered after it knew or should have known of the employee's propensity.

*Hutchison ex. rel Hutchison v. Luddy*, 560 Pa. 51, 64 (1999).

The logic in *Hutchison* squarely applies to this case.  Defendants had a duty not to retain employees that they knew or should have known had a propensity for sexual harassment. Defendants were informed of Rosario's propensities in December 2017, when Smith filed a report of sexual harassment.  *See* First Am. Compl. ¶ 52.  Defendants' breached their duty to Smith when they failed to undertake an investigation to remedy the past harassment and ensure appropriate supervision of Rosario to deter him from engaging in further harm.  The injuries that Smith sustained were foreseeable; by virtue of Smith's report, Defendants knew that they needed to exercise control over Rosario.  Moreover, the harm that Rosario perpetrated was also foreseeable, as Defendants permitted Rosario to access Smith in the workspace even after she reported him twice. *Id.* ¶ 58.

Based on these facts, Defendants may be liable for the harm that resulted after Smith's first report in December 2017 up until Rosario's termination in June 2018.

H.  Availability of Punitive Damages

Defendants note that Smith cannot receive punitive damages under the PHRA, *see* Defs. Mem. 30, which is correct.  *See Hoy v. Angelone*, 554 Pa. at 146.  But Plaintiff is entitled to seek punitive damages on her surviving state law negligence claim, although it may be difficult for her to ultimately prevail.  The Pennsylvania Supreme Court has noted that negligent supervision actions under Section 317 of the Second Restatement can sustain an award of punitive damages if the plaintiff can show "the conduct of the defendant[s] went well beyond negligence and into the realm of the outrageous."  *Hutchison ex rel Hutchison v. Luddy,* 582 Pa. 114, 124 (2005). Outrageous conduct is an act "done with a bad motive or with a reckless indifference to the interests of others."  *Focht v. Rabada*, 268 A.2d 157 (Pa. Super. Ct. 1970). Moreover, "[r]eckless indifference to the interests of others" has been interpreted to mean that the "actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm will follow."  *Evans v. Phila. Transportation Company*, 418 Pa. 567, 574 (1965).

In *Hutchison*, the court also noted that, "[it]  may be that, as a practical matter, it proves more *difficult* to sustain a claim for punitive damages against the 'master' in the negligent supervision context than it might be with other negligence-based torts, given that the more direct harm (which, as here, may well involve an intentional tort) will usually have been inflicted directly by the 'servant.'"  582 Pa. at 126.  Although the same practical considerations clearly apply to this case, which will make it more difficult for Plaintiff to succeed on a punitive damage claim, more evidence of the decisionmakers' state of mind may emerge in discovery.

I.   Defendants' Motion to Strike

Rule 12(f) allows a court to strike any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f).  As stated previously, there is "general judicial agreement" that these motions "should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy."  5C Arthur R. Miller, Mary Kay Kane & A. Benjamin Spencer, *Federal Practice and Procedure* § 1382 (3d ed. 2020). Defendants' concerns include Smith's contentions that "the discrimination and retaliation will continue;" that she is an "independent contractor" and that "the Dorman Defendants engaged in a pattern and practice of discrimination." Defs. Mem. 34.  These claims, as conclusory and vague as they are, potentially relate to the extent of Defendants' discriminatory practices as well as the employee-employer relationship between Smith and Dorman.  Such boilerplate assertions also cannot reasonably be considered "scandalous" matter.  I will therefore deny Defendants' Motion to Strike.

**V.**   **Conclusion**

For the reasons set forth above, Defendant' Motion to Dismiss Plaintiff's First Amended Complaint will be granted in part and denied in part.  An appropriate order follows.

  /s/ Gerald Austin McHugh
United States District Judge